# Richmond

## AMERICAN CYANAMID COMPANY v. COMMONWEALTH OF VIRGINIA.

June 14, 1948.

Record No. 3368.

Present, All the Justices.

The opinion states the case.

*S. H. Williams*, for the plaintiff in error.

*Ballard Baker, Special Assistant to the Attorney General,* for the Commonwealth.

BUCHANAN, J., delivered the opinion of the court.

This appeal presents a question of authority as between the Commission of Game & Inland Fisheries, herein called the Commission, and the State Water Control Board, herein called the Board, in a case of stream pollution.

The Commission caused two warrants to be issued against American Cyanamid Company, herein called the defendant, both charging it with casting noxious substances into Piney river in violation of section 3305(43) of the Code, 1942 (Michie), herein called the Fish Law.

The first warrant was issued October 16, 1946, charging a violation on September 5, 1946. On a hearing before the Trial Justice on November 22, 1946, the defendant was convicted and fined $25.

The second warrant was issued August 25, 1947, charging a violation on August 12, 1947. Trial was had before the Trial Justice on October 27, 1947. The defendant was again convicted and fined $25.

Both convictions were appealed to the circuit court, and on trial by the court without a jury the defendant was found guilty in both cases and fined $25 in each. This writ of error was allowed to those judgments.

The facts were agreed in both cases and those considered material to the issue before us are these:

The defendant operates a chemical plant on Piney river in Nelson county for the purpose of producing titanium dioxide. The operation, embodying the process now used, was begun in 1932. The ore from which the ultimate product is obtained is found in combination with clay and other material. It is first crushed at a mill in Amherst county, then separated by a process which includes washing and the washings are released into Piney river. The concentrated ore is then carried to the chemical plant in

Nelson county, just across Piney river, and there chemically treated to extract the titanium.

In the course of these operations the defendant discharged into Piney river two kinds of waste, one being solid materials in suspension and the other sulphuric acid in liquid form. The solid material discolors the water, but the defendant claims it is harmless to fish life. Moreover, the defendant has begun the construction of a settling basin, which is expected to settle out most of the solid material.

The defendant admits that the other type of material— dilute sulphuric acid—which it wastes into the stream, constitutes pollution and destroys aquatic life; and so it admits that on the days charged in the warrants, and prior thereto, it did cast noxious substances into Piney river, by which fish or fish spawn would be destroyed if there were any then in the river.

The production and disposal of this acid is inseparable from the defendant's plant operation. The method employed, which results in the acid waste, is the method commonly used in all plants producing titanium dioxide. The storage or accumulation of this acid waste is impossible. The acid is produced so rapidly that it has to be disposed of immediately, else the plant would have to shut down. This defendant and other companies with the same problems of disposal have spent much time and money in an effort to discover a practical method for the recovery of this acid. A research subsidiary of this defendant has recently developed what is considered a promising method and the defendant expects to install at Piney river at a cost of $175,000 a plant to test the proposed method, and if successful, to consider the construction of a full scale plant at a cost of about $700,000.

The defendant has, as stated, discharged this acid waste into the river since 1932, and the Commission has known of it. Its agents made inspections in August and December, 1944, and were notified of the plans for the settling basin, which was expected to eliminate a large part of the solids waste, and of the research under way to handle the acid

waste, for which no practical method had then been found. A further visit was made on September 5, 1946, which resulted in the conclusion by the Commission that satisfactory progress had not been made. The warrants and convictions followed.

On this appeal the defendant contends, first, that the Fish Law is not broad enough, and was not designed, to prohibit stream pollution by acid waste. We have no difficulty in concluding otherwise. The part of the statute with which we are presently concerned is copied in the margin.[1]

However inaptly described and illogically placed in the Code, as noticed in *Good* v. *Commonwealth*, 155 Va. 996, 154 S. E. 477, still, the second clause of the section prohibits the casting of "noxious substance or matter into any water course of this State by which fish therein or fish spawn may be destroyed." Admittedly that is what the defendant is doing now and has been doing for years. In the agreed facts it is stated that "by means of such acid discharge (the defendant) did, on September 5, 1946, and prior thereto, cast noxious substances into Piney River, by which fish or fish spawn therein (if any were then in said stream) might have been destroyed." The same

[1] Section 3305(43). *Prohibition against use of substances injurious to fish.*—It shall be unlawful to use fish berries, lime, giant powder, dynamite, or any other substance for the destruction of fish, or knowingly cast any noxious substance or matter into any water course of this State by which fish therein or fish spawn may be destroyed, or to place or to allow to pass into the water courses of the State any sawdust, ashes, lime, gas, tar, or refuse of gas works, injurious to fish; * * * .

This statute first appeared in Code, 1887, ch. 96, section 2108(4), as a codification of Acts 1874-75, ch. 188; Acts 1876-77, ch. 212; Acts 1878-79, ch. 61. The title of the Code chapter was "Unlawful fishing." This fourth paragraph of Code section 2108 was re-enacted without change in language in Acts 1893-94, p. 779; Acts 1906, p. 307; Acts 1910, p. 425; Acts 1912, p. 473. It was carried into the Code of 1919 as the fourth paragraph of Sec. 3195 thus: "Sec. 3195. Unlawful fishing. * * * Fourth. *Prohibition against use of substances injurious to fish.*"

In 1930 all statutes referring to game, inland fish and dogs were consolidated into one Act and called "The Game, Inland Fish and Dog Code of Virginia." (Acts 1930, p. 634; Code, 1942 (Michie), ch. 130, secs. 3305(1) *et seq.*).

admission applied to the offense charged in the second warrant.

The main contention of the defendant is that the State Water Control Law repealed *pro tanto* the Fish Law, or so far subordinated it that there can be no conviction of the defendant under the Fish Law on the facts of this case. The State Water Control Law, chapter 399, Acts 1946, Code Supp., 1946, chapter 63B, sections 1514-b 1-26, by its terms became effective July 1, 1946. The provisions of it pertinent to this discussion are copied in the margin.[2]

This Act was the result of a study by the Virginia Advisory Legislative Council, made pursuant to legislative directive. That body, in its report to the Governor and General Assembly (House Document No. 15), stated that "abatement and control of industrial wastes must be handled so as to provide for adequate and fair treatment of (1) existing industry in its present size and using present processes, and (2) new industry together with the expansion of existing industry or the use of new processes by such industry;" and that in the bill submitted to accompany its

[2] Section 1514-b 1. Short title; purpose.—The short title of this law is State Water Control Law. It is the purpose of this law to (1) safeguard the clean waters of the State from pollution, (2) prevent any increase in pollution, and (3) reduce pollution existing when this law is adopted.

Section 1514-b 4. Public policy regarding discharge of sewage or industrial wastes or other wastes in State waters.—The discharge by any owner not having a certificate issued by the Board, of sewage, industrial wastes, or other wastes or any noxious or deleterious substances into State waters, which is detrimental to the public health, or to animal or aquatic life, or to the uses of such waters for domestic or industrial consumption or for recreation, is hereby declared to be against public policy.

Section 1514-b 9. Powers and duties of the Board.—It shall be the duty of the Board and it shall have the authority, jurisdiction and power:

(1) To exercise general supervision over the administration and enforcement of this law, and all rules, regulations and special orders promulgated thereunder.

(2) To study and investigate all problems concerned with the pollution of State waters and its prevention, abatement, and control and to make reports and recommendations thereon.

(3) To establish such standards of quality for any waters in relation to the reasonable and necessary use thereof as it deems to be in public interest, and such general policies relating to existing or proposed future pollution as it deems necessary to accomplish the purposes of this law, to modify,

recommendations "provision is made for compelling existing industry, only when it can reasonably control its pollution, to take steps to treat its effluents properly." The report further stated that Virginia had sought industries for many years as a source of employment and income for its people and for revenue for the government, and that these industries "have reason to expect fair treatment from legislation to control pollution and this should be of such nature as will enable them to adjust their operations to its provisions without severe dislocation;" that the bill submitted "provides that no action shall be taken against existing industry until that industry has an opportunity to control its harmful pollution. Appeal from action of the Board is provided to safeguard the rights of those affected."

The State Water Control Law, as finally enacted, followed closely the bill submitted by the Advisory Council, except in two particulars, which are largely controlling here. Section 1514-b 9 (1) of the Council's bill provided that the Board should have jurisdiction and power "to exercise general supervision over the administration and enforcement of all laws relating to the pollution of the State waters."

amend or cancel any such standards or policies established and to take all appropriate steps to prevent pollution contrary to the public interest or to standards and policies thus established.

(4) To conduct scientific experiments, investigations and research to discover economical and practical methods for preventing pollution. * * * .

(5) To issue certificates for the discharge of sewage, industrial wastes and other wastes into or adjacent to State waters, and to prescribe conditions with respect to same, and to revoke or amend such certificates, such revocation or amendment to be made for good cause and after proper hearing, with at least thirty days' notice to the owner of the time, place and purpose thereof.
* * * * * *

(8) To issue a special order or orders directing any particular owner or owners to secure within the time specified therein, such operating results as are reasonable and practicable of attainment toward the control, abatement, and prevention of pollution of the State waters. * * * .
* * * * * *

Section 1514-b 17. Discharges of existing industrial wastes.—Upon request of the Board any owner who on the date this law becomes effective is discharging or permitting to be discharged industrial wastes into any waters of the State shall within twelve months after such request apply to the Board for a certificate to continue discharging waste into said waters.

That section was changed by the Assembly and section 9 (1) of the bill, as enacted, provides that the Board shall have power and jurisdiction "to exercise general supervision over the administration and enforcement of this law, and all rules, regulations and special orders promulgated thereunder."

Section 23 of the bill recommended by the Council provided "this law is intended to supplement existing law and no part thereof shall be construed to repeal any existing laws specifically enacted for the protection of health or the protection of fish and game of the State."

That section was amended by the Assembly, made section 24, and as enacted provides:

"This law is intended to supplement existing law and no part thereof shall be construed to repeal any existing laws specifically enacted for the protection of health or the protection of fish, shellfish and game of the State, *except*

The Board shall issue such certificate for an indefinite period. The owner may be required by the Board, from time to time, to adopt measures for the reduction of said pollution, and to furnish pertinent information with regard to the progress he has made in reducing same. The Board may revoke the certificate in case of a refusal to comply with all such reasonable and proper requirements and may issue a special order after a reasonable notice and a hearing.

\* \* \* \* \* \*

Section 1514-b 21. Penalties.—Any owner violating, or failing, neglecting or refusing to comply with any special final order of the Board, or a court, lawfully issued as herein provided, shall, upon conviction be liable to a fine of not less than fifty dollars ($50.00), nor more than five hundred dollars ($500.00) for each violation within the discretion of the court, and each day of continued violation after conviction shall constitute a separate offense and may subject the system, business, or establishment causing pollution in violation of this law to abatement as a nuisance.

\* \* \* \* \* \*

Section 1514-b 24. This law supplementary to existing law.—This law is intended to supplement existing law and no part thereof shall be construed to repeal any existing laws specifically enacted for the protection of health or the protection of fish, shellfish and game of the State, except that the administration of any such laws pertaining to the pollution of State waters, as herein defined, shall be in accord with the purpose of this law and general policies adopted by the Board; \* \* \* .

Section 1514-b 25. Private civil rights not affected.—The fact that any owner has or held a certificate issued hereunder shall not constitute a defense in any civil action involving private rights.

that the administration of any such laws pertaning to the pollution of State waters, as herein defined, shall be in accord with the purpose of this law and general policies adopted by the Board; * * *." (Emphasis added).

The effect of that exception on the present convictions under the Fish Law is the precise problem for solution. Specifically applied, it requires that the Fish Law shall be administered so as to accord with the purpose of the Water Control Law and the general policies adopted by the Board.

The purpose of the Water Control Law is clearly stated in its first section, the element of that purpose applicable here being to "reduce pollution existing when this law is adopted." How shall that purpose be accomplished—by immediate use of criminal process or by the use of remedial measures developed by study of the problem? Are these prosecutions and penalties under the Fish Law in accord with the purpose of the Water Control Law?

The history of the Water Control Law and the terms of that law leave little room for doubt or speculation as to how its purposes are to be attained. Some waters of the State are clean, others are polluted. Pollution is a recognized evil and is against public policy when caused by one *not having a certificate issued by the Board* (section 1514-b 4). The end desired is to keep the clean waters clean and to reduce the pollution in the unclean waters. Some of this pollution comes from industrial waste, discharged by industries invited into the State and furnishing employment to some of its people. The problem is to be dealt with so as to give fair treatment to the industries, to its employees and to the public. That requires a measuring and balancing of the interests involved. Some waters should be kept pure. A measure of pollution in others is necessary. Not all pollution can be abruptly stopped. On the agreed facts here, for example, this industry would have to shut down if immediately required to cease discharging its acid waste into the river. The aesthetic and recreational features involved in the pollution problem are

important, but the opportunity to make a living may be even more so.

And so the purposes of the Act are to be accomplished by investigation, study and experiment so as to establish standards of quality for different waters, considering the reasonable and necessary use thereof in relation to the public interest. Then, having determined the quality to be maintained in a given stream, ascertained after hearing granted to the interested parties, the Board is furnished with means to enforce its regulations (section 1514-b 21).

The agreed facts here are that this defendant adopted a method of settling out the solids discharged into the river, which it and the agents of the Commission thought might prove effective. Upon learning that it was not entirely so, other measures to that end have been worked out and are in process of installation. Research has been continued through the years for the elimination of the acid waste. A method promising success has recently been developed. The defendant expects to erect an experimental plant to test that method, and if successful to establish a permanent plant at great cost. If not allowed the necessary time the alternative is to shut down its operation. That alternative is the possible result of continued prosecutions under the Fish Law. Very clearly that procedure is not in accord with the purposes of the Water Control Law.

The general policies adopted by the Board, with which administration of the Fish Law must also accord, are not yet definitely established, so far as this record shows. These policies will necessarily be controlled by the terms of the Act and be formed and executed to effect its purposes. It appears that discretion is vested in the Board as to the cases of pollution over which it shall assert jurisdiction. Section 17 of the Act provides that *on request of the Board* an owner who is discharging industrial waste into a stream at the effective date of the Act shall apply to the Board for a certificate to continue to do so. On October 21, 1947, the Board had issued 127 such certificates. One of these was issued to the defendant. The request from

the Board came on November 20, 1946, and on April 2, 1947, the Board issued to this defendant its certificate "to continue to discharge industrial waste into the Piney River."

The offense charged against the defendant in the first warrant was committed September 5, 1946, prior to the request from the Board and prior, also, of course, to the date of the certificate. The offense charged in the second warrant was committed August 12, 1947, after the issuance of the certificate by the Board. As to this second offense, therefore, the situation presented is that this defendant has been convicted under the Fish Law for an act authorized by the Water Control Board, acting under specific authority of the Water Control Law. Patently such result was not intended. It seems clear that as to this second offense that part of the Fish Law on which the prosecution was based has not been administered in accord with the purposes of the Water Control Law and the general policies so far adopted by the Board.

The two laws must be read together and the provisions of the earlier Fish Law given effect so far as may be done without denying effect to the clear provisions of the later Water Control Law. This is not only required by the terms of the Water Control Law but is also a familiar rule of statutory construction.

"Repeal by implication is not favored and the firmly established principle of law is, that where two statutes are in apparent conflict, it is the duty of the court, if it be reasonably possible, to give to them such a construction as will give force and effect to each." *Scott* v. *Lichford*, 164 Va. 419, 422, 180 S. E. 393, 394. *Danville* v. *Ragland*, 175 Va. 27, 7 S. E. (2d) 121.

But if a later statute does not by its terms or by necessary implication repeal entirely a former one *in pari materia*, yet if it clearly appears that the later statute was intended to furnish the only rule to govern a particular case, it repeals the former to that extent. And in deciding that question "the occasion and the reason of the enact-

ment, the letter of the act, the context, the spirit of the act, the subject matter and the provisions of the act, have all to be considered." *Fox* v. *Commonwealth,* 16 Gratt. (57 Va.) 1, 10. *Western Assur. Co.* v. *Stone,* 145 Va. 776, 134 S. E. 710, 48 A. L. R. 1009; *Vining* v. *Probst* (Mo. App.), 186 S. W. (2d) 611.

In *Girard Trust Co.* v. *Philadelphia,* 336 Pa. 433, 9 A. (2d) 883, it appears that an Act of 1907 established a system of elevator inspection in Philadelphia and created an administrative agency to prescribe rules governing standards of safety. An Act of 1937 established a general system of elevator inspection for the whole State and created a separate administrative agency with equal power to prescribe like rules. In holding that the provisions of the two enactments were repugnant and irreconcilable the court said (pp. 885-86):

"* * * Each department has full power and authority to establish standards of safety in the construction, maintenance and operation of elevators and to provide regulations which are adapted to that end. The mere existence of two independent administrative agencies with unlimited power to fix conflicting standards governing the same subject matter and who even now appear antagonistic indicates that which is possible in the future. Requirements of each agency could be made so conflicting that operation would be impossible. This fact clearly indicates that the Legislature did not intend the existing municipal regulation to continue. * * *."

Here the General Assembly did intend the existing law to continue, and said so, but to be administered in accord with the purposes of the Water Control Law and the general policies of the Board. The Fish Law does not deal specifically with existing industrial waste which is one of the principal concerns of the Water Control Law. It provides no machinery for establishing standards of quality for waters in relation to their reasonable and necessary use as determined to be in the public interest. The Fish Law is a criminal statute and a prosecution under it

involves only the question of guilt or innocence, without any regard to reasonable and necessary use in the public interest. As applied to pollution by industrial waste existing at the effective date of the Water Control Law, and of which the Board assumes jurisdiction given by that Law, the provisions of the two statutes are irreconcilable. The last expression of the Legislature on that subject in the Water Control Law must be held to supplant the Fish Law to the extent that the provisions of the latter formerly applied to such a case of industrial pollution, but to leave the Fish Law otherwise in force and effect.

The Water Control Board is not given jurisdiction of all matters to which the Fish Law applies, as appears from a comparison of the two statutes. Also the jurisdiction of the Board in cases of industrial pollution has been made selective. The application for a certificate to continue to discharge industrial waste is made on the request of the Board (section 1514-b 17). Until the Board assumes jurisdiction in a particular case, by making such request and issuing its certificate, all the provisions of the Fish Law remain in effect.

Applying these conclusions to the cases in hand, it follows that the offense committed on September 5, 1946, was subject to prosecution under the Fish Law and the judgment of conviction for that offense is affirmed. At the time of the offense alleged in the second warrant—August 12, 1947—the Board had assumed jurisdiction and granted authority to the defendant to continue to discharge its industrial waste into the stream. The judgment of conviction for that offense is, therefore, reversed and that case is dismissed.

*Affirmed in part, reversed in part*
*and final judgment.*