# Richmond

## City of South Norfolk, et al. v. City of Norfolk.

March 13, 1950.

Record No. 3622.

Present, Gregory, Eggleston, Spratley, Buchanan and Staples, JJ.

The opinion states the case.

*James G. Martin & Sons* and *Jerry G. Bray, Jr.*, for the appellants.

*Jonathan W. Old, Jr.* and *Charles L. Kaufman*, for the appellee.

BUCHANAN, J., delivered the opinion of the court.

The city of South Norfolk and two of its citizens brought this proceeding for a declaratory judgment, Code, 1942 (Michie), sec. 6140a; Code, 1950, sec. 8-578, asking an adjudication that the city of Norfolk is legally obligated to supply water to South Norfolk for its city uses, free of charge, and to its citizens at the same price and under the same conditions as Norfolk furnishes water to its own citizens; or, if not at the same rates, then at proper rates to be fixed by the court.

There was a stipulation as to certain facts, and others appear from evidence heard orally in which there is no

material conflict. The trial court entered a decree holding that Norfolk was not obligated by law, contract or otherwise to furnish water to South Norfolk or its inhabitants, and that consequently it was unnecessary to determine the other issues. This appeal is from that decree.

Since before 1900 South Norfolk has been supplied with water successively by water companies, the city of Portsmouth and the city of Norfolk. The first company, chartered in 1892, Acts 1891-1892, p, 455, constructed a water plant, laid pipes and furnished water to the then town of Berkley (which became part of Norfolk in 1906) and to the village of South Norfolk, which became a town in 1919, Acts 1919, Extra Session, ch. 91, p. 154, and a city of the second class in 1921, chartered as such in 1922, Acts 1922, ch. 121, p. 200.

In 1902 that company and two others were consolidated into one company called Portsmouth, Berkley and Suffolk Water Company (hereinafter called the water company), Acts 1901-1902, ch. 63, p. 54, which furnished water to Portsmouth, Suffolk, Berkley and South Norfolk until 1918.

By writing dated October 1, 1917, the water company granted to Norfolk an option to buy within ten years from December 1, 1917, the water system owned by the water company in Berkley (then part of Norfolk), on condition that it also purchase the water company's property in Washington Magisterial District, Norfolk county, which included South Norfolk. By deed of December 30, 1918, the water company conveyed to the city of Portsmouth all of its rights, franchises and properties, and the water company was then dissolved. Later, Norfolk notified Portsmouth of its election to exercise its option, and by deed dated June 30, 1923, Portsmouth conveyed to Norfolk all the waterworks system located in Berkley ward of Norfolk and in said magisterial district, including South Norfolk.

From January 1, 1919, Portsmouth supplied water to South Norfolk through a main laid by the water company in 1903 under the south branch of Elizabeth river, from

the source of supply and installations on the Portsmouth side acquired from the water company. After the conveyance to it by the city of Portsmouth, Norfolk sealed off the main from Portsmouth, connected its own water supply to the distribution system in Berkley and South Norfolk through mains laid by it under the east branch of the river, and ever since July 1, 1923, it has furnished water to South Norfolk and its inhabitants. Since 1925 and until October 18, 1948, written contracts have been in effect between Norfolk and South Norfolk in which Norfolk obligated itself to furnish water, only out of its surplus supply, to South Norfolk and its residents at agreed rates. By the first of such written contracts, dated October 27, 1925, Norfolk agreed to construct certain pipelines and facilities in addition to those already owned by it in South Norfolk at an estimated cost of $70,500, with provision for future extensions for additional service. The last contract, dated October 18, 1938, substantially identical with prior contracts, ran for ten years. By it Norfolk agreed to furnish to South Norfolk and its inhabitants, through its mains therein, water out of its surplus supply only, with the provision that there should be no obligation on Norfolk to supply any water to South Norfolk when in the judgment of the council of Norfolk it did not have a sufficient supply for its own use, or when to do so would interfere with the discharge of its duty to its own citizens.

Norfolk declined to renew this contract on its expiration in October, 1948, but offered a new contract at increased rates, which South Norfolk rejected, and this litigation followed.

South Norfolk contends that Norfolk is required to supply it and its residents with water by virtue of the provisions of section 3017 of the Code, 1942 (Michie), copied in the margin,* providing that when a city purchases a water

*§ 3017. Cities and towns to have power to purchase, etc., and maintain electric and water plants operating in contiguous territory.—1. An act approved March fourteenth, nineteen hundred and eight, and entitled an act giving to cities and towns upon leasing or purchasing gas, electric and

plant operating within contiguous territory, it shall have all the rights, privileges and franchises of the company so purchased; and shall rest under obligation to furnish, from the property so acquired, or from any other source, an adequate supply of water to the customers of the company whose plant was so purchased. This statute was enacted as chapter 288 of the Acts of the General Assembly of 1918, Acts 1918, p. 465, which was approved March 16, 1918, and became effective from its passage. It applies to gas, electric and water companies.

Norfolk contends that this statute has no application because (1) what Norfolk acquired by its deed from Portsmouth was not a "water plant" but only a water distribution system; (2) this water distribution system was not acquired from a private or public service corporation but from the city of Portsmouth; and (3) the distribution system was not acquired under said section 3017 but under the Norfolk charter of 1918, which became effective September 1, 1918, and repealed section 3017 so far as that section related to Norfolk.

(1) When what is now section 3017 was first enacted in 1908, Acts 1908, ch. 331, p. 586, it gave to the

water companies operating in territory contiguous to its corporate limits the right to continue to operate, maintain and extend same, be amended and re-enacted so as to read as follows:

2. Whenever any city or town shall lease or purchase any gas, electric or water plant operating within territory contiguous to such city or town, the said city or town so leasing or purchasing, shall have all the rights, privileges and franchises of the company or companies so leased or purchased, and the power to operate, maintain and extend the same, in all the territory which the plant or plants so leased and purchased had the right of operation in; and any city or town acquiring or leasing any said property hereunder shall rest under obligation to furnish, from the said property so leased or acquired, or from any other source, an adequate supply of gas, electricity or water to the consumers of any said company whose plant is so purchased or leased.

3. By reason of the fact that the time within which certain cities or towns of the Commonwealth have the right to acquire said plants will expire within less than ninety (90) days, an emergency is declared to exist under section fifty-three of the Constitution and this act shall go into effect from its passage.

city or town purchasing a water plant all the rights and franchises of the company purchased and the power to operate, maintain and extend the same in all the territory in which the plant so purchased had a right to operate. The clause of the present statute creating the obligation to serve the consumers of the plant so purchased was added by the act of 1918. Its purpose is obvious. It was to protect people and communities previously dependent upon a public service company for water from the calamity of being deprived of water by the sale to a city or town of the properties of such company. It would be of little benefit to those it was designed to protect if it could be circumvented by the expedient of dividing the plant and selling its parts to different cities. What happened here was that the distribution system in South Norfolk was cut off from the Portsmouth source of supply and attached to the Norfolk source of supply following the voluntary election by Norfolk to exercise its option and take over that part of the water system that had been serving South Norfolk. There can be no doubt at all that if Norfolk had not exercised its option, Portsmouth would have been required by the statute to continue supplying water to South Norfolk. It did so from the time of its conveyance from the water company to the time it conveyed the South Norfolk system to Norfolk. We do not think Norfolk can escape that obligation by intervening and requiring the South Norfolk system to be transferred to it.

In the deed to Norfolk from Portsmouth, Norfolk specifically convenanted and agreed "that it will and does hereby assume all the contractual obligations of the party of the first part (Portsmouth), outstanding on July 1, 1923, made in connection with and applicable to said water works in Berkley Ward of the City of Norfolk and Washington Magisterial District of Norfolk County, for the supply of water to its consumers, for leases, rights-of-way, et cetera."

Ever since that conveyance, and for more than twenty-five years, Norfolk has continued to supply water to South

Norfolk and its inhabitants, at rates and upon terms agreed upon by the two cities. It is true that by the conveyance from Portsmouth, made in compliance with the option from the water company, to which Portsmouth's purchase from the water company was subject, Norfolk did not take what was then a complete water plant. It did, however, take what had been a water plant, supplying the needs of South Norfolk and its citizens. It consisted of its own source of supply, 100 twenty-foot wells, together with pumps and boilers. The use of these wells was abandoned in 1912 by the water company after South Norfolk had been by that company connected with a much beter source of supply from the Portsmouth side. But the original source of supply remained and a test was made in 1917, during a water shortage, to determine whether the South Norfolk plant would produce water of satisfactory quality. It was found that it was not then satisfactory. However, the water company did in fact take over and operate a water plant in South Norfolk. It afterwards changed the source of supply, and after that change the system was sold to Portsmouth and by Portsmouth to Norfolk, under the latter's option. Norfolk again changed the source of supply, but the fact remains that what Norfolk acquired was the water plant of South Norfolk with its supply changed to a different source, first by the water company and later by Norfolk. With that acquisition ought to go the obligation imposed by the statute to furnish water to South Norfolk and its inhabitants, consumers of the company which had sold this plant, and which Norfolk supplied from the "other source" selected by it, as provided for by the statute. The resulting situation was one, we think, which the statute was meant to cover, so recognized by the affected parties, as evidenced by the provision of the deed from Portsmouth to Norfolk, and respected in the contracts and dealings between Norfolk and South Norfolk ever since.

(2) We cannot agree with the contention of Norfolk that the statute was rendered inapplicable by the fact that

Norfolk's deed to the South Norfolk property was from Portsmouth, a municipal corporation, and not from the water company. The deed was from Portsmouth, it is true, but the sale was made by the water company before it conveyed to Portsmouth, by the option subject to which the South Norfolk plant was conveyed to Portsmouth, and which was converted from a conditional sale to an absolute sale by the voluntary election of Norfolk. Portsmouth became the agency through which the property previously contracted to Norfolk by the water company was transmitted to Norfolk.

(3) Prior to the 1923 deed from Portsmouth to Norfolk, both section 3017 (the 1918 act) and the 1918 Norfolk charter had been enacted by the General Assembly and were then in effect. The statute, effective March 16, 1918, as stated, was general and applied to all the cities of the Commonwealth, requiring them, upon acquiring a water plant operating in contiguous territory, to furnish water to the customers of that plant. The Norfolk charter was, of course, local, applying only to the city of Norfolk. It became effective September 1, 1918, after the effective date of the statute. By its terms it repealed the existing charter and the several acts amendatory thereof, "and all other acts and parts of acts inconsistent with this charter so far as they relate to the city of Norfolk." Acts 1918, *supra*, ch. 34, sec. 147, pp. 93-4.

By this charter the city was given power to acquire and operate public utilities, to acquire an adequate water supply for the city, and to erect and maintain a system for its distribution. At the end of section 2 (9), dealing with water supply, is this specific provision (Acts 1918, *supra*, ch. 34, p. 34): "The said city may sell or supply to persons, firms or industries residing or located outside of the city limits any surplus of water it may have over and above the amount required to supply its own inhabitants."

This provision would appear to make statutory, as relating to Norfolk, a right which this court later held to exist with-

out the aid of a statute. *Mount Jackson* v. *Nelson*, 151 Va. 396, 145 S. E. 355; *Warwick Co.* v. *Newport News*, 153 Va. 789, 808, 151 S. E. 417, 423; *Light* v. *Danville*, 168 Va. 181, 204, 190 S. E. 276, 285.

The specific provisions of the charter which became effective subsequent to the effective date of the statute are effective and controlling, as related to Norfolk, as against repugnant or inconsistent provisions of the prior general statute. *Trehy* v. *Marye*, 100 Va. 40, 44, 40 S. E. 126, 128; *Chambers* v. *Roanoke*, 114 Va. 766, 768, 78 S. E. 407, 408; *Portsmouth* v. *Weiss*, 145 Va. 94, 108, 133 S. E. 781, 785; *Fonticello Mineral Springs Co.* v. *Richmond*, 147 Va. 355, 359-60, 137 S. E. 458, 459; *Commonwealth* v. *Rose*, 160 Va. 177, 180, 168 S. E. 356, 357; *Scott* v. *Lichford*, 164 Va. 419, 180 S. E. 393; *Petersburg* v. *General Baking Co.*, 170 Va. 303, 196 S. E. 597; *American Cyanamid Co.* v. *Commonwealth*, 187 Va. 831, 841-3, 48 S. E. (2d) 279, 285; *Richmond* v. *Dervishian, ante*, p. 398, 57 S. E. (2d) 120.

But to accomplish repeal by implication of an earlier general law by a later special act, the latter must be repugnant to and irreconcilable with the former. As we said in *Scott* v. *Lichford, supra*, 164 Va. at p. 422, 180 S. E. at p. 394:

"Repeal by implication is not favored and the firmly established principle of law is, that where two statutes are in apparent conflict, it is the duty of the court, if it be reasonably possible, to give to them such a construction as will give force and effect to each. 36 Cyc. 1146." See *Petersburg* v. *General Baking Co., supra.*

"Except where an act covers the entire subject-matter of earlier legislation, is complete in itself, and is evidently intended to supersede the prior legislation on the subject, a later act does not by implication repeal an earlier act unless there is such a clear, manifest, controlling, necessary, positive, unavoidable, and irreconcilable inconsistency and repugnancy, that the two acts cannot, by a fair and reasonable construction, be reconciled, made to stand together, and be given effect or enforced concurrently. Moreover, a statute

is only repealed by the repugnancy of matter in a subsequent statute to the extent of such repugnancy, and if any part of the earlier act can stand as not superseded or affected by the later act, it is not repealed." 50 Am. Jur., Statutes, sec. 543, pp. 550-52.

Indeed, the general repealing clause of the charter, by its express terms, repeals only acts and parts of acts "inconsistent with this charter so far as they relate to the city of Norfolk."

Looking, then, to determine in what respect the provision of the charter with which we are concerned is inconsistent with the prior statute, we find that the statute, as we construe it, requires Norfolk to furnish water to South Norfolk and its residents. The charter, on the other hand, empowers the city to do that which the statute makes it the duty of the city to do, but with the limitation and restriction that the water so furnished shall only be "any surplus of water it (Norfolk) may have over and above the amount required to supply its own inhabitants." There is no irreconcilable inconsistency and repugnancy between the two provisions, so that the later must destroy the earlier. The only necessary repugnancy is that the later limits and designates the *res* upon which the earlier shall operate. In this respect and to this extent the charter "must be construed to be a qualified amendment of the general law." *Chambers* v. *Roanoke, supra,* 114 Va. at p. 768, 78 S. E. at p. 408.

This conclusion results from applying the settled rule of construction that two statutes apparently in conflict should be construed, if reasonably possible, "so as to allow both to stand and to give force and effect to each." *Scott* v. *Lichford, supra,* 164 Va. at p. 423, 180 S. E. at p. 394. Not only is this construction in keeping with the language of the repealing provision of the charter; it is in keeping also with the guide followed by many courts, that where two statutes are passed by the same session of the legislature, as was the case here, that fact furnishes strong evidence that they were intended to stand together. 50 Am. Jur., Statutes,

sec. 547, p. 553.   It also is in harmony with the contracts existing for more than twenty-five years between the two cities, indicating their acceptance of this as the duty of the city of Norfolk under the law and under the agreement made by Norfolk in its deed from Portsmouth in 1923.

Accordingly we hold that Norfolk is under legal obligation to supply South Norfolk and its inhabitants with water from any surplus that Norfolk may have over and above the amount required to supply its own inhabitants.

But this duty is subject to a further limitation.   The duty imposed upon Norfolk by the statute, as modified by its charter, is to furnish from its surplus an adequate supply of water to the consumers of the water company whose plant was purchased.   In its deed from Portsmouth, referred to above, Norfolk assumed the obligations of Portsmouth applicable to the waterworks in Berkley Ward and in Washington Magisterial District of Norfolk county, which included South Norfolk.

The record before us does not indicate the extent of Norfolk's statutory or contract obligations to consumers in Washington Magisterial District outside of South Norfolk. There may be others to whom Norfolk owes a duty under the statute or under its deed equal to the duty it owes to South Norfolk and its inhabitants.   The statute does not give South Norfolk a right superior to the rights of other persons protected by the statute.   Neither does it warrant a construction that would put a legal duty on Norfolk to forego all other commitments of its surplus supply in order to serve the additions to South Norfolk and its inhabitants that have occurred since Norfolk took over from Portsmouth under its option and that may occur in the future.

We hold, therefore, that the legal obligation of Norfolk to furnish South Norfolk and its inhabitants with water from its surplus supply extends only to the consumers, whether residents of the city of South Norfolk, or beyond its boundaries, who were being supplied by the facilities which the city of Norfolk purchased and took over on

June 30, 1923. Such consumers are not limited to the particular individuals who were being supplied at that time, but include all inhabitants within the area which was being supplied, or which was capable of being supplied, by the facilities so acquired.

It was stipulated below by the parties that the trial court, in addition to deciding the question of legal obligation, which this opinion decides, should also determine whether it had jurisdiction to entertain, and if so, decide, the question raised as to the reasonableness and discrimination of the rates. The trial court having decided that the legal obligation did not exist did not, therefore, reach the additional issues and they have not been presented or argued before us.

We therefore reverse the decree appealed from and remand the cause for adjudication of the remaining issues.

*Reversed and remanded.*