## Richmond

COMMONWEALTH OF VIRGINIA, DEPARTMENT OF TAXATION

V.

ORANGE-MADISON COOPERATIVE FARM SERVICE

January 11, 1980.

Record No. 771422.

Present: All the Justices.

*John G. MacConnell, Assistant Attorney General* (*Marshall Coleman, Attorney General, on briefs*), for appellant.

*George H. Roberts, Jr.* (*Donald E. Showalter; Wharton, Aldhizer & Weaver, on brief*), for appellee.

I'ANSON, C. J., delivered the opinion of the Court.

Orange-Madison Cooperative Farm Service filed an application, pursuant to Code § 58-1130, for correction of an allegedly erroneous assessment of sales and use taxes on certain machinery, fuel, and equipment used in its feed and fertilizer operations. The trial court held that because the machinery, fuel, and equipment were used in manufacturing or processing, they were exempt from sales and use taxes under the provisions of Code § 58-441.6.

The sole question presented is whether Orange-Madison's operation of its feed and fertilizer plants constituted industrial processing within the meaning of Code § 58-441.6.*

Orange-Madison is a cooperative formed to aid farmers in their collective purchasing of farm products and supplies. As a part of its operation, it maintains three feed plants and two fertilizer plants. Feed sales comprise 50% of Orange-Madison's total sales amounting to seven million dollars annually. Fertilizer sales comprise approximately

---

* Code § 58-441.6 provides in part:

"**Exclusions and exemptions.**—The terms 'sale at retail,' 'lease or rental,' 'distribution,' 'use,' 'storage' and 'consumption' shall not include industrial materials for future processing, manufacturing, refining, or conversion into articles of tangible personal property for resale where such industrial materials either enter into the production of or become a component part of the finished product; nor shall such terms include industrial materials that are coated upon or impregnated into the product at any stage of its processing, manufacture, refining, or conversion for resale; nor shall such terms include machinery or tools or repair parts therefor or replacement thereof, fuel, power, energy, or supplies, used directly in processing, manufacturing, refining, mining or conversion of products for sale or resale; nor shall such terms include materials, containers, labels, sacks, cans, boxes, drums or bags for future use for packaging tangible personal property for shipment or sale."

Acts 1979, c. 575 at 836 added subsection (çc) to Code § 58-441.6, redesignated as subsection (ff). Under subsection (ff), various items used in the production of feed for sale or resale are specifically exempted. Acts 1979, c. 575, cl. 2, at 836, provides, however, that the provisions of the act "shall be prospective in effect only and shall not affect any litigation currently before the courts." Consequently, the issue before us is not resolved by the amendment.

15% of Orange-Madison's sales. Orange-Madison sells almost all its feed and fertilizer directly to the farmer. Less than 2% of the feed is sold to merchants, who then resell the feed to farmers.

At the feed plants, corn, barley, and wheat are passed through a steam cooker, where moisture is added and the grain is cracked. The grain is then flattened by passing through two rollers and is subsequently dried. The process then requires the addition of several different ingredients: soybean or peanut meal, vitamins, minerals, salt, and liquid molasses. All of these elements are then blended to achieve a final product. At the fertilizer plants, nitrogen, potash, phosphate, and other chemicals are blended by machinery into a finished fertilizer product meeting the individual farmer's needs as determined by scientific testing of soil conditions.

Large quantities of raw materials used in making the feed and fertilizer are delivered for processing to Orange-Madison's plants in railroad cars and trucks. After processing, the bulk of the finished products is sold to farmers in large quantities.

The Department of Taxation contends that processing, like manufacturing, entails a transformation of a raw material into an article or product of substantially different character. The Department argues that the ingredients in the feed and fertilizer have not undergone such a transformation and that consequently Orange-Madison's feed and fertilizer operations constitute neither industrial processing nor manufacturing. The Department further argues that commercial retail operations are not entitled to the exemption under the standard set forth in *Golden Skillet Corp.* v. *Commonwealth,* 214 Va. 276, 199 S.E.2d 511 (1973).

■ We first address the Department's contention that processing, like manufacturing, necessarily entails a transformation of raw material into an article of substantially different character. Language in our prior decisions indicates that processing and manufacturing are not synonymous. We have consistently characterized taxpayers' operations as processing even though they failed to meet the requisites of manufacturing. In *Prentice* v. *City of Richmond,* 197 Va. 724, 731, 90 S.E.2d 839, 843 (1956), we stated that a taxpayer's chicken "processing operation [lacked] the necessary qualitative element of manufacturing." In *Richmond* v. *Dairy Co.,* 156 Va. 63, 71, 157 S.E. 728, 730 (1931), we described the pasteurization of milk to be a "process" even though it did not constitute manufacturing. Likewise, in *Solite Corp.* v. *King George Co.,* 220 Va. 661, 665, 261 S.E.2d 535, 538 (1980) (this day decided), we held that the "processing of sand and gravel does not constitute manufacturing within the meaning of Code

§ 58-266.1(A)(4)." These decisions indicate that the definition of processing is considerably less stringent than our definition of manufacturing. While all manufacturing is a type of processing, not all processing constitutes manufacturing.

In the absence of a statutory definition, as here, a statutory term is given its ordinary meaning, given the context in which it is used. *Loyola Fed. Savings* v. *Herndon,* 218 Va. 803, 805, 241 S.E.2d 752, 753 (1978). "Processing" is defined in Webster's Third International Dictionary (1966), to the extent here pertinent, as follows:

> to subject to a particular method, system, or technique of preparation, handling or other treatment designed to effect a particular result: put through a special process: as ... (1): to prepare for market, manufacture, or other commercial use by subjecting to some process (processing cattle by slaughtering them) (processed the milk by pasteurizing it) (processing grain by milling) (processing cotton by spinning) (2): to make usable by special treatment (processing rancid butter) (processing waste material) (processed the water to remove impurities)

This definition, unlike our definition of manufacturing, does not require transformation of a raw material into an article of substantially different character. It merely requires that the product undergo a treatment rendering the product more marketable or useful. The mixing together of the grains and additives in the production of the feed and the mixing together of the chemicals in the production of the fertilizer satisfies all the requisites of processing. Both procedures result in products which are more marketable and useful.

■ Not all processing, however, qualifies for the exemption set forth in Code § 58-441.6. In *Golden Skillet, supra,* we concluded that this exemption applied only to "machinery and tools used in processing, manufacturing, refining, mining, or conversion of products for sale or resale only *in the industrial sense.*" 214 Va. at 278, 199 S.E.2d at 514 (emphasis in original). Because "[c]ommon sense tells us that the process of preparing and frying chicken for sale at retail...is not an industrial operation," 214 Va. at 279, 199 S.E.2d at 514, we rejected Golden Skillet's claim that its machinery and equipment used in processing chicken for sale at retail to its customers were exempt under Code § 58-441.6. Courts in other states have also held that machinery and equipment used in processing food for sale in restaurants do not qualify for sales and use tax exemptions. *See, e.g., McDonald's Corp.* v. *Oklahoma Tax Commission,* 563 P.2d 635 (Okla.

1977). The common theme underlying most of these decisions, including that in *Golden Skillet,* is that processing done by a restaurant is ancillary to the service provided by the restaurant and consequently is not within the ambit of the exemption.

■ We did not conclude in *Golden Skillet,* as argued by the Department in this case, that a retailer was never entitled to claim an exemption for machinery and equipment used in industrial processing. Instead, we agreed in *Golden Skillet* with the Attorney General's contention that the exemption was intended to apply " 'only to true manufacturers or industries, and not to retailers *such as restaurants.' "* 214 Va. at 278, 199 S.E.2d at 513 (emphasis added). Nothing in *Golden Skillet* suggests, however, that a company otherwise entitled to claim an exemption for machinery and equipment used in industrial processing would be denied the exemption merely because it sold the processed goods at the retail level. Code § 58-441.6 provides an exemption for machinery used in processing articles "for sale or resale" and in no fashion indicates that the processed products must be sold at the wholesale level in order for the processor to be entitled to the exemption.

Underlying the Department's contentions in this case is the Department's reliance upon a rigid distinction between industrial processors and retailers. Bluntly stated, the Department's assertion is that a company cannot be both a retailer and an industrial processor. According to the Department, even the most complex and substantial processing cannot be considered industrial processing if it is done by a retail merchant. Such a view wrongly focuses upon the nature of the processor's sale of the products, rather than the nature of the processing itself.

The problems underlying the Department's contention are evidenced in the present case. The Department conceded in oral argument that the size and volume of Orange-Madison's operations were industrial in nature. In its brief, the Department acknowledged that several indicia of an industrial operation had been met: large inventories, the size of the plant, the amount of investment, and the degree of mechanization. Nevertheless, the Department contended that the machinery involved was not exempt as machinery used in industrial processing. Because we believe that it is necessary to focus upon the nature of the processing itself, rather than the nature of the processor's sale of the products, we reject the Department's suggestion that the retail nature of the taxpayer's operations is dispositive of the question before us.

For the reasons stated, the machinery, fuel, and equipment used

by Orange-Madison in its feed and fertilizer plants are exempt as items used in industrial processing. Consequently, the judgment of the court below is

*Affirmed.*