## CIRCUIT COURT OF THE CITY OF RICHMOND

Mary Sue Terry,
Attorney General
of Virginia

v.

L. Douglas Wilder,
Governor of Virginia

December 29, 1992

Case No. (Chancery) HC-1307-2

BY JUDGE ROBERT L. HARRIS, SR.

The ultimate issue before the Court is whether the Governor has the legal authority to remove and replace the Office of the Attorney General as the legal representative of a state agency, in this case the Virginia Retirement System ("VRS"). The Court finds that replacing the Office of the Attorney General as counsel for VRS in all representative capacities is to replace the Office as "regular counsel." Because this conflicts with § 2.1–121 of the Code of Virginia, the Court rules that the Governor lacks such sweeping authority.

During the course of the proceedings leading to the Decree issued December 23, 1992, two preliminary issues were presented to the Court, the Attorney General's Petition for a Temporary Injunction and the Governor's Motion to Quash Subpoenas Duces Tecum. Although the Court's rulings on those matters were announced in open court, they will be set forth in this letter opinion, for the purposes of the record prior to discussing the Court's ultimate ruling.

### Petition for a Temporary Injunction

By letter dated December 10, 1992, the Governor informed the Attorney General that because of conflicts of interest he felt existed between her and the VRS, he deemed it necessary to replace her as counsel for that agency. At a meeting of the Board of Trustees on December 16, 1992, the Board was informed by the Secretary of Administration that it was the Governor's position that the Attorney General no longer served as legal counsel to the VRS.[1] That evening, the Attorney General's Office filed a Bill of Complaint seeking both a Declaratory Judgment from the Court ascertaining the validity of the Governor's action and seeking permanently to enjoin such action. At the same time, the Attorney General requested that the Court entertain a Petition for a Temporary Injunction. An emergency hearing was set for that same evening. Although an attempt to give notice of the emergency hearing to the Governor was made by the Attorney General's office, no formal notice was delivered. Consequently, only the Attorney General's representatives appeared at the hearing on December 16, 1992.

Having doubts about the receipt by the Governor of *actual* notice of the emergency hearing and recognizing the significant legal questions at issue, the court suggested that the hearing be continued until the following morning, allowing additional time to give valid notice to the Governor of the injunction hearing. Given the absence of evidence that significant harm would be suffered were the hearing on the Petition for Temporary Injunction continued as suggested by the Court, the hearing was continued until the morning of December 17, 1992. *See* Va. Code Ann. § 8.01–629 (1992) (giving court discretion to require notice to defendant, prior to granting injunction); *see also, Bristow v. Home Building Co.*, 91 Va. 18, 23–24, 20 S.E. 947, 949

---

[1] In her testimony at the hearing on December 22, 1992, the Secretary of Administration, Ms. Ruby G. Martin, confirmed that her statements to the VRS Board were authorized by the Governor. (Transcripts of Dec. 22, 1992, Hearing at 32).

(1895) (except in cases of "obvious necessity for prompt action," notice of injunctive proceeding should be given to defendant).

At the December 17, 1992, hearing, Walter McFarlane and Richard Taylor appeared on behalf of the Governor and requested a continuance of the hearing in order to allow the Governor to obtain counsel.[2] The Court did not find a continuance of the hearing on the preliminary injunction to be necessary because, based upon the evidence presented, issuance of the requested injunction was not warranted. Although the Attorney General presented evidence regarding the harm that *might* obtain if the doubts about legal representation for VRS continued, such evidence was insufficient to support the need for the temporary injunction.

Additionally, Mr. McFarlane represented to the Court that a preliminary injunction was unnecessary because the governor was willing to promise that he would not, during the pendency of the suit, appoint substitute counsel for VRS. However, Mr. McFarlane further represented that, because of the continuing conflicts the Governor perceived between the Attorney General and the VRS Board of Trustees, the Governor was not willing to stipulate that, in that same interim, the Attorney General's office would continue as "regular counsel" for VRS. Unwilling to allow the VRS Board to remain in legal limbo and wishing to minimize the potential for harm which might arise from unnecessary delay, the Court scheduled an expedited hearing on the merits of the Attorney General's Petition for a Declaratory Judgment and Permanent Injunction for December 22, 1992. Because the Court found that the VRS faced no immediate harm due to uncertainty about the status of that agency's legal representation; because temporary injunctions should be granted only in emergency circumstances; and because injunctions should only be entered against high elected officials with great circumspection, the Court found issuance of the requested temporary injunction inap-

---

[2] Although both Mr. McFarlane and Mr. Taylor are licensed attorneys, they work in the Governor's Office of Policy and would not normally represent the Governor in legal matters. Clearly, since it was the Attorney General's Office which sought to enjoin action by the Governor, her office would be unable to provide the Governor with the legal services it would normally provide, pursuant to § 2.1–121 of the Virginia Code. Accordingly, in her letter of December 16, 1992, accompanying a copy of the Bill of Complaint in this suit, the Attorney General, pursuant to § 2.1–122(d), certified the need for the Governor to employ "special counsel."

propriate. With the assurance of Mr. McFarlane that the Governor could obtain counsel by the date of the expedited hearing and that the obtained counsel would be ready to proceed by that date, the Court declined to issue the temporary injunction. *See, Virginia Ry. v. Eckols*, 117 Va. 182, 184, 83 S.E. 1082, 1083 (1915) ("A mandatory injunction will not be granted upon a preliminary hearing except in cases of strong and imperious necessity, where the right to the injunction is clear."); *see also Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 359 (4th Cir. 1991) (in a case arising in West Virginia, the court affirms the circuit's adoption of a hardship-balancing test for preliminary injunctions, involving not only the likelihood of success and the public interest, but looking primarily to the likelihood of harm to parties with or without the requested injunction).

### Motion to Quash

On December 17, 1992, in preparation for the merit hearing on December 22, 1992, the Attorney General subpoenaed certain records from the Governor, the Secretary of Administration, and the Executive Director of the VRS. The following day, the Governor moved the Court to quash those subpoenas on procedural grounds and on grounds of relevance and executive privilege. For the following reasons, the Court quashed each subpoena duces tecum, either in whole or in part.

The subpoena duces tecum issued to the Governor was without legal effect for it was not obtained with "prior order of the court." *See* Va. Sup. Ct. R. 4:9(c-1) (1992). Accordingly, that subpoena was quashed in its entirety.

The subpoenas duces tecum issued to the Secretary of Administration and the Executive Director of the Virginia Retirement System did not require prior court approval and, therefore, were not immediately fatally defective. However, the documents requested in Items One through Four were all documents compiled by the Governor's immediate staff and were related to the Governor's decision to replace (or at least consider replacing) the Attorney General as legal representative to the VRS. As such, these documents were subject to a claim of executive privilege, regardless of whether they were in the possession of the Governor or of a subordinate. In *United States v. Nixon*, the United States Supreme Court recognized that there is a:

> valid need for protection of communications between high
> Government officials and those who advise and assist them

in the performance of their manifold duties . . . . Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decision-making process.

*United States v. Nixon*, 418 U.S. 683, 705 (1974); *see also Taylor v. Worrell Enterprises*, 242 Va. 219, 223, 409 S.E.2d 136, 139 (1991) (the court, in executive privilege analysis, balances legislative need against executive branch disruption). This Court assumed, without deciding, that the acts and contemplations of the Governor were within his constitutional and statutory authority, and that, therefore, documents and memoranda prepared by subordinates to assist him in his exercise of that authority are protected by executive privilege.

Nevertheless, that privilege is not unqualified and is subject to intrusion either by the legislature or judiciary where an overriding need for the requested material can be shown. *See Nixon*, 418 U.S. at 707; *Taylor*, 242 Va. at 223–24, 409 S.E.2d at 139. No such overriding need existed here. The documents sought related to carrying out the Governor's stated intention to replace the Attorney General as legal representative of VRS. The ultimate issue before the Court, brought there by the Attorney General's request for a declaratory judgment, was whether the Governor had the legal authority to replace the Attorney General as legal representative for a state agency. The Governor's intentions had nothing to do with this specific question of legal authority but were relevant only to whether an "actual controversy" existed, as there must be to give the Court jurisdiction to consider a Petition for a Declaratory Judgment. *See* Va. Code Ann. § 8.01–184. Because the Court concluded that the Governor's words spoke for themselves and that the Governor intended to replace the Attorney General as legal counsel for VRS, the court found unnecessary further evidence of the Governor's intentions.

There was no question that such an actual controversy existed. In his December 10, 1992, letter to the Attorney General, the Governor made clear his intent to replace her as legal representative to the VRS. So clear was that intent that in open court on December 17, 1992, the Governor's legal representative informed the Court that the Governor, while promising not to appoint replacement counsel during the pendency of this suit, would not agree to stipulate that the Attorney General continued to represent the VRS during that interim. Consequently, the issue of whether or not the Governor had

the legal authority to remove and replace the Attorney General as legal counsel for a state agency was joined.

Because the material sought was unnecessary for the decisions facing the Court at that point in the suit, there was no judicial need substantial enough to overcome the qualified executive privilege. Accordingly, items One through Four of the subpoena duces tecum to the Secretary of Administration and the Director of the VRS were quashed.[3]

The material sought in Item Five involved records and minutes of meetings of the VRS Board of Trustees. Because such documents, although created by an agency situated within the Executive Branch, do not serve to advise and assist the Governor in making decisions and formulating policy in the same manner as do the other requested documents, the executive privilege analysis is different. *Cf. Taylor*, 242 Va. at 223, 409 S.E.2d at 139 ("proper inquiry focuses on the extent to which [intrusion by another governmental branch] prevents the Executive Branch from accomplishing its constitutionally assigned roles") (quoting *Nixon v. Administrator of Gen. Serv.*, 433 U.S. 425, 443 (1977)). With respect to the Governor's constitutional and statutory responsibilities, the need for confidentiality, with regard to such documents, was weaker. The fact that a portion of the documents related to public sessions of the VRS Board of Trustees made the need nonexistent with respect to those documents, and the Governor made no serious argument that executive privilege attaches to those VRS records. Although the issues before the Court are almost entirely legal and, therefore, the relevance of the material sought is only marginal, discovery of those materials will be allowed. *See* Va. Sup. Ct. R. 4:1(b)(1) (discovery of any nonprivileged, relevant material allowed). Accordingly, the Motion to Quash the subpoenas duces tecum issued to the Secretary of Administration, and the Director of the VRS was denied with respect to Item Five only.[4] Because some of the records involved a meeting or

---

[3] For the same reasons, the request of the Attorney General that the Court give its approval to issue a new subpoena duces tecum to the Governor, pursuant to Rule 4:9(c-1) was also denied. The privilege which protected the executive branch documents sought from the Secretary of the Administration and the Director of the Virginia Retirement System certainly protected those same documents when held by the Governor.

[4] Although similar material was sought from the Governor, it is presumably avail-

meetings held in executive session, with the Attorney General's office in attendance, that material was subject to a Protective Order and was to be used only by the Attorney General or her designated assistants for matters related to this suit.

### Declaratory Judgment and Permanent Injunction

The Court believes that the actions of the Governor clearly demonstrate an intent to remove and replace the Attorney General as legal representative of the VRS. Such a move appears to be in conflict with the words of § 2.1–121 of the Virginia Code which, among other things, states that "No regular counsel shall be employed for or by the Governor or any state department . . . agency [or] entity." Va. Code Ann. § 2.1–121 (1992). Accordingly, an "actual controversy" exists, as must be the case if this Court is to have jurisdiction to hear a petition for declaratory judgment. *See* Va. Code Ann. § 8.01–184.

Although the public's attention in this all-too-public spectacle between elected state officials may have fixated on the personalities involved, the issues raised transcend those personalities. The Attorney General's counsel engaged in hyperbole when she characterized the actions of the Governor as rivaling those of President Nixon in the Watergate scandal, but the constitutional implications of this dispute are unquestionable. Looming beyond the egos involved are divergent views of the parallel, but not always compatible, roles of two elected officials, the Governor, the highest executive branch official, and the Attorney General, the state's chief legal officer. Although the Court is certainly aware of the political undertones in this controversy, the legal questions raised must be resolved, for the potential mischief of the dispute may remain long after the current occupants of those offices have left the stage.

Because the Attorney General is considered a part of the Executive Branch, *see* Va. Const., art. V, § 15, the Governor, as holder of the "chief executive power," *see id.* § 1, seeks to exercise that power to oversee the activities of the Attorney General. "As my December 10 letter indicates, there has been a breakdown of the attorney-client relationship between your office and the Virginia Retirement System which . . . in my judgment, renders your office unable to render

---

able from the other sources, since it was not material the Governor would normally possess. Accordingly, the Court also denied the Attorney General's request, pursuant to Rule 4:9(c-1), that a subpoena be issued to the Governor for that material.

effective legal representation to VRS and requires the appointment of other counsel for VRS." (Governor's Letter of Dec. 21, 1992, at 2.) This assertion by the Governor of authority to pass judgment on the propriety of the manner in which the Attorney General carries out her statutorily assigned duties presents the Court with the fundamental question, in this case whether the Governor has such authority in Virginia's governmental scheme.

The authority and responsibility given to the Attorney General is significant in Virginia's governmental design. "The Attorney General shall be the chief executive officer of the Department of Law, and as such, shall perform such duties as may be provided by law." Va. Code Ann. § 2.1–117. At a minimum, this provision recognizes the quasi-independent role established for the Attorney General in Virginia's constitutional scheme, in which both the Governor and the Attorney General are elected officials, see Va. Const., art. V, §§ 2, 15, and both have distinct areas of authority. See id. §§ 1, 7, 15; Va. Code Ann. §§ 2.1–38 to 2.1–51, 2.1–117 to 2.1–133.4 (1987 & Supp. 1992). "By virtue of its heritage and its position at the junction between the executive and judicial branches, the office of Attorney General tends to [have] greater inherent powers than do other departments of the state administration." 2 A.E. Dick Howard, *Commentaries on the Constitution of Virginia* 661 (1974) (hereinafter *Commentaries*). This transitional position of the Attorney General is demonstrated by the office's constitutional placement, prior to the adoption of the 1971 Constitution, within the Judicial Article, see Va. Const. § 107 (1902). In the 1971 Constitution, the office was relocated within the Executive Article, at the apparent urging of the Virginia Senate.[5]

Although the shifting of the Attorney General from the Judicial Article in the Virginia Constitution to the Executive Article illustrates the transitional posture of the Office between two of three Governmental branches, in the context in which the shift took place, it demonstrates little else of substantive value. During the debates

---

[5] The 1969 Report of the Commission on Constitutional Revisions left the Attorney General's Office within the Judicial Article, see 1969 House & Senate Documents 55 (Proposed Revised Constitution, art. VI, § 12), a proposal accepted by the House in its version of the Judicial Article. See 1969 House Journal 124 (H.J.R. No. 12, including art. VI, § 12). However, it was the Senate version, see id. at 371–72 (S.J.R. No. 23, including art. V, § 15), which was ultimately adopted by the General Assembly. See 1970 Va. Acts. 1712.

held before adoption of the 1971 Constitution, Mr. Garnett S. Moore, of the House Committee for Courts of Justice, was asked about the constitutional location of the Attorney General's Office.

> We felt that the section could be put in either place. Certainly, it has been in the Judiciary Article all these years and has worked very well. There is some argument that it should be put over in the Executive Article because the work of the Attorney General perhaps is more in that branch. The committee felt that we would just leave it where it was for the time being and then make some decision on that a little later if we had to.

*Proceedings and Debate of the Virginia House of Delegates Pertaining to Amendment of the Constitution* 125 (1970) (Debate of March 24, 1969). Accordingly, this Court finds that the fact of the constitutional shift offers nothing significant to the issues in this case.

The role of the Attorney General as chief legal officer for the Commonwealth is one the Governor's attempted action in the instant case fails to acknowledge. *Cf.* Va. Const., art. V, § 15 (effectively requiring that the Attorney General be licensed to practice law in Virginia). The Virginia Supreme Court, however, has recognized the complexity of the legal role assigned to the Attorney General. In *Hladys v. Commonwealth*, 235 Va. 145, 366 S.E.2d 98 (1988), a health care provider challenged on due process grounds the administrative appeal procedure employed by the State Department of Health. In the appeal of the termination of Dr. Hladys' contract as a "physician-provider" with the Virginia Medicaid Program, the Attorney General's office served as both legal advisor to the Department's hearing officer and as legal counsel for the Commonwealth at the hearing before the hearing officer. Dr. Hladys argued that this arrangement deprived him of his due process right to an impartial decision maker. *See id.* at 147, 366 S.E.2d at 99. In finding that the dual roles of the Attorney General's office did not inherently violate due process, the Virginia Supreme Court noted that "[t]he Attorney General is directed by Code § 2.1–121 to render 'all legal service' in civil matters for the Commonwealth and all its agencies . . . . The Attorney General complied with that mandate by assigning separate assistants to prosecute the case and to advise the hearing officer on procedure." *Id.* at 148, 366 S.E.2d at 100. By explicitly acknowledging the complicated role assigned to the Attorney General's office, the court implicitly acknowledged that dual roles are appropriate and

presumptively fair in the governmental context, although they might, in non-governmental contexts, give the appearance of impropriety.

> The Supreme Court of Washington, considering a similar problem, decided that the assignment of a single assistant attorney general to perform such a dual role would impair at least the appearance of fairness of the tribunal, but that the potential problem would be resolved by the appointment of different attorneys general for the performance of disparate functions.
>
> The official conduct of assistant attorneys general is entitled to a presumption of honesty and fairness no less than that accorded to the acts of other public officials . . . . [T]he institutional connection between the two assistant attorneys general involved in this proceeding did not, *per se*, impair the right of Dr. Hladys to procedural due process.

*Id.* at 148–49, 366 S.E.2d at 100 (citing *Medical Disciplinary Bd. v. Johnston*, 99 Wash. 2d 466, 480, 663 P.2d 457, 465 (1983)).

The Governor has cited disagreement between the Attorney General and the VRS Board of Trustees (or at least certain Board members) and her subsequent public criticism of the Board as the primary reasons for his finding that independent counsel was needed for VRS. (Governor's Letter of Dec. 21, 1992, at 1). Since the dual, potentially inconsistent roles played by the Attorney General's Office in the *Hladys* context did not facially violate the stringent standards of procedural due process, potentially similar and inconsistent roles in the instant context can provide little justification for the Governor's actions absent statutory authority.

The complex, independent role of an elected Attorney General derives not merely from the fact of that election, but also from a combination of the common law role of the Attorney General, *cf.* Va. Code Ann. § 1–10 (common law of England generally continued in force in Virginia) and the fact that all governmental power is derived from the electorate. *Cf.* Va. Const., art. I, § 2 ("[A]ll power is vested in, and consequently derived from, the people.").

> It is the general consensus of opinion that in practically every state of this Union whose basis of jurisprudence is the common law, the office of attorney general, as it existed in England, was adopted as a part of the governmental machinery, and that in the absence of express restrictions, the com-

mon-law duties attach themselves to the office so far as they are applicable and in harmony with our system of government.

*Hansen v. Barlow*, 23 Utah 2d 47, 456 P.2d 177, 178 (1969), *quoted in Ex parte Weaver*, 570 So. 2d 675, 684 (Ala. 1990).

Although in Virginia, the common law authority of the Attorney General has not been explicitly recognized by the courts, the constitutional and statutory scheme strongly suggests such a conclusion.

> The historical development of the office, coupled with precedents from states with comparable constitutional and statutory schemes, would argue in favor of the existence of such powers springing from common law. *In most states where the constitution says that the attorney general's duties shall be "as prescribed by law," this is taken to mean that he has such common law powers as have not been specifically repealed by statute* - a conclusion sometimes bolstered by reference to early statutory adoption of the common law.

2 Howard, *Commentaries, supra*, at 665–66 (referring to Va. Const., art. V, § 15, and Va. Code Ann. § 1–10) (citations omitted) (emphasis added). *But see Manchin v. Browning*, 296 S.E.2d 909, 915 (W. Va. 1982) (court adopts minority view that attorney general lacked common law authority because the Virginia Constitution had originally placed the office within the judiciary, thus abrogating any common law executive branch powers and because reference to "duties . . . prescribed by law" produced only *statutory* authority).

In oral argument, counsel for the Governor characterized discussion of the common law role of attorneys general as "irrelevant." He is only partially correct. He would be entirely correct if the Court accepted his further argument that Virginia statutes provide the Governor with the authority he seeks, authority to replace the Attorney General as legal representative for state agencies. Because the Court ultimately rejects that argument, the discussion is relevant, either because Virginia sides with the majority of states that grant common law authority to an attorney general when not repealed or altered by statute or because Virginia sides with West Virginia in the latter's view that the common law was not adopted with respect to the attorney general but has constructed a statutory scheme which adopts many of the common law principles. In the latter instance, discussion of the common law view aids in understanding the statutory scheme.

Under the common law of England, the Attorney General was the legal representative of the Crown, who was the embodiment of "the rights and liberties of his people." 2 Howard, *Commentaries, supra,* at 661. Since, from the American (and Virginian) perspective, the people's rights needed no such embodiment, it follows that an elected Attorney General, in the American system, is the people's legal representative.

> The [Indiana] General Assembly had rejected the position that the Governor should be able to appoint an Attorney General and adopted the position that it was desirable to have an Attorney General elected by the people and primarily responsible to them, in order to safeguard his duty to give independent legal advice without being beholden to the chief executive, and to furnish some independent protection to the individual citizen when he had a controversy with the State or its agencies. It was an implementation of the American philosophy of checks and balances in government. Before 1943, many of the various boards, bureaus and commissions had been employing their own attorneys, with no effective authority vested in the Attorney General to establish a general legal policy for such agencies, and no responsibility of counsel to the Attorney General. Independent legal representation for the State could not be accomplished under such practice, and Chapter 70 of the 1943 Acts was enacted to give the State independent legal representation under an Attorney General responsible to the people.

*Indiana State Toll-Bridge Comm'n v. Minor*, 236 Ind. 193, 199, 139 N.E.2d 445, 448 (1957). In *Minor*, the court apparently distinguished between the approach in Indiana and that in Virginia, by holding that the Toll Bridge Commission, because it was only an "instrumentality . . . of the state" and not "the state in its corporate sovereign capacity," *id.* 139 N.E.2d at 449, could employ its own counsel, without consent of the Attorney General. *See id.* 139 N.E.2d at 448–49.

In Virginia, all state entities, along with the Governor, are forbidden to employ their own "regular counsel." *See* Va. Code Ann. § 2.1–121. Therefore, the independent role contemplated for the Attorney General by the Virginia scheme is undiluted, contrary to the apparent situation in Indiana. Accordingly, the role is more akin to

that described by the Illinois Supreme Court in discussing the position of popularly-elected officials.

> The governor is, neither in fact nor in theory, personally or politically responsible for the conduct of the secretary, or any other officer. He cannot assign him the performance of a single duty, or control him in the performance of those assigned by law . . . . He looks to the law for his authority and duties, and not to the governor.

2 Howard, *Commentaries, supra,* at 663, n.18 (quoting *Field v. People,* 3 Ill. 79 (1839)); *cf. Blair v. Marye,* 80 Va. 485, 495 (1885) (by withholding salary of Attorney General, the legislature illegally attempted "to put a constitutional officer in *such a situation* that he cannot hold his office and discharge its duties.") Accordingly, this Court believes that the independent role of an elected attorney general is not subject to intrusion by another elected official - in this instance, the Governor - unless some specific statutory authority grants such a power.

The obligations of the Attorney General to the public, under the merging of the English common law treatment with the American electoral system, is the critical point missed by the Governor in the instant case. This failure by the Governor is fatal to his analysis of his relationship with the Attorney General even if this Court accepts his argument that the judiciary cannot examine the reasons for a decision to appoint "special counsel."

> [T]he Attorney General's powers encompass advising and representing the State and all agencies in all legal proceedings. In addition, although an attorney-client relationship exists between a State agency and the Attorney General, it cannot be said that the role of the Attorney General apropos of a State agency is precisely akin to the traditional role of private counsel apropos of a client. Indeed, where he or she is not an actual party, the Attorney General may represent opposing State agencies in a dispute . . . . *The Attorney General's responsibility is not limited to serving or representing the particular interests of State agencies, including opposing State agencies but embraces serving or representing the broader interests of the State.*

*State v. Mississippi Public Serv. Comm'n,* 418 So.2d 779, 782 (Miss. 1982) (quoting *EPA v. Pollution Control Bd.,* 69 Ill. 2d 394, 14 Ill.

Dec. 245, 372 N.E.2d 50, 52–53 (1977)) (emphasis added); *See also Connecticut Comm'n on Special Revenue v. Connecticut Freedom of Info. Comm'n*, 174 Conn. 308, 387 A.2d 533, 537 (1978) (Attorney General, as "chief civil law officer . . . must, to the best of his abilities, fulfill his 'public duty as Attorney-General and his duty as a lawyer to protect the interest of *his client, the people of the State*'.") (quoting *Levitt v. Attorney General*, 111 Conn. 634, 641, 151 A. 171, 174 (1930) (emphasis added); *Feeney v. Commonwealth*, 373 Mass. 359, 366 N.E.2d 1262, 1266 (1977) (The Attorney General is empowered "to decide matters of legal policy which would normally be reserved to the client in an ordinary attorney-client relationship.").

The Governor's misconception of the role played by the Attorney General in the governmental scheme also leads to his erroneous suggestion that she violated legal ethics by publicly criticizing the VRS Board of Trustees. Because the Attorney General's real client is the people of the state, her relationship with state entities she represents is "not constrained by the parameters of the traditional attorney-client relationship." *Feeney*, 366 N.E.2d at 1266. Although some might question the judgment exercised in the Attorney General's public criticism of the VRS Board and believe that the more discreet approach suggested in the testimony of former Attorney General Andrew Miller[6] might initially have been more appropriate, the exercise of that judgment is left to the Attorney General as the state's chief legal officer. Neither this Court nor the Governor is empowered to supervise her job performance. Only through subsequent popular elections, or, in particularly egregious circumstances, the impeachment power, *see* Va. Const., art. IV, § 17, can that performance be second-guessed. *Cf. State v. Wells*, 79 S.D. 389, 403, 112 N.W.2d 601, 608 (1961) (Biegelmeier, J., dissenting) (as "general legal adviser [to state agencies] . . . [i]f the Attorney General should be derelict in the performance of such duties, there is a proper remedy therefor").

Although the Governor's letter of December 10, 1992, to the Attorney General clearly reflects his intention to replace the Attorney General as legal representative to VRS with "independent counsel,"

---

[6] In his testimony, Attorney General Miller acknowledged that such public criticism is unusual, although the Attorney General has a responsibility to bring inappropriate practices "to the attention of those involved in the agency and to the attention of the Governor." (Tr. of Dec. 22, 1992, Hearing at 59–60).

his letter of December 21, 1992, attempts to finesse the question by referring to appointment of "special counsel," and by articulating specific roles to be played by that counsel. The Governor's counsel characterized this effort as demonstrating exactly the limited purpose and scope contemplated by the special counsel provisions of § 2.1–122(a) but conceded in oral argument that the Attorney General was to be replaced in all representative capacities. (Tr. of Dec. 22, 1992, Hearing at 133–34.) The substance of this effort is revealed in the Governor's own words, "I still believe that VRS must . . . have counsel that is *totally* independent from you and your office." (Governor's Letter of December 21, 1992, at 4 (emphasis added).) This statement follows the Governor's earlier assertion in that same letter that the "breakdown of the attorney-client relationship" had rendered the Attorney General's office "unable to render effective legal representation to VRS." (*Id.* at 1.) It is, therefore, clear that, regardless of label, the substituted "independent" or "special" counsel would replace the Attorney General in all matters of legal representation of the VRS.

The Governor's counsel suggested, in oral argument, that the Governor's reference to "discreet matters" being handled by the Attorney General's office demonstrated the limited duties of the special counsel. However, a careful reading of the Governor's December 21, 1992, letter reveals that it is the Governor's intention that the Attorney General's office continue handling these "discreet matters" only to the extent that "VRS may direct and in consultation with the interim special co-counsel." (Governor's Letter of Dec. 21, 1992, at 5.) Such a directive places the state's chief legal officer in a subservient position not only to the special counsel but to the state agency.

> In consolidating all the legal business of the Commonwealth in one office, the Legislature empowered and perhaps required the Attorney General to set a unified and consistent legal policy for the Commonwealth. It would defeat this apparent purpose to allow an agency head, representing narrow interests and with a limited scope, to dictate a course of conduct to the Attorney General and in effect to destroy any chance of uniformity and consistency.

*Secretary of Admin. & Fin. v. Attorney General*, 367 Mass. 154, 326 N.E.2d 334, 339 (1975).

The Governor seeks, in part, to find his authority for replacing the Attorney General as legal representative for VRS in the lack of ex-

plicit definitions within §§ 2.1–121 and 2.1–122 for the terms "regular" or "special" counsel. However, "in the absence of a statutory definition . . . a statutory term is given its ordinary meaning, given the context in which it is used." *Commonwealth v. Orange-Madison Coop. Farm Serv.*, 220 Va. 655, 658, 261 S.E.2d 532, 533 (1980). Given the customary understanding of the term "regular counsel," removal of the Attorney General's office from all legal representation of VRS is functionally no different from overtly removing her office from its role as "regular counsel."[7] Therefore, the single issue facing this court, linguistics notwithstanding, is whether the Governor has the statutory authority to replace the Attorney General as "regular counsel" for a state agency.

At the outset, although much of the Governor's arguments go to the factual basis for his decision, he challenges the jurisdiction of this Court to "look behind" his reasons for appointing "special counsel." Assuming, without deciding, that he is correct in that assertion, the Court notes that it is not "second-guessing" the Governor when it examines his legal authority for acting on a decision. *Cf. Dakota Cent. Tel. Co. v. South Dakota*, 250 U.S. 163, 184 (1919) ("[A]s the contention at best concerns not a want of power but a mere excess or abuse of discretion in exerting a power given, it is clear that it involves considerations which are beyond the reach of judicial power.").

The issue before the Court, as both parties concede, turns entirely upon analysis of three statutes. Section 2.1–121 of the Virginia Code states, in relevant part:

> All legal service in civil matters of the Commonwealth . . . and every state department . . . agency [or] entity . . . shall be rendered and performed by the Attorney General, *except as hereinafter provided in this chapter* . . . . No regular counsel shall be employed for or by the Governor or any state department . . . agency [or] entity . . . .

*Id.* § 2.1–121 (1992) (emphasis added). Section 2.1–122 states, in relevant part:

---

[7] *Black's Law Dictionary* defines "regular" as "usual, customary or general." Black's Law Dictionary 1155 (5th ed. 1979). Conversely, "special" is defined as "designed for a particular purpose; confined to a particular purpose [or] object." *Id.* at 1253.

No special counsel shall be employed for or by the Governor or any state department . . . agency [or] entity . . . except in the following cases:

(a) Where *because of the nature of the service to be performed*, the Attorney General's office is unable to render same, the Governor after issuing an exemption order stating with particularity the facts and reasons upon which he bases his conclusion that the Attorney General's office is unable to render such service, may employ special counsel to render such service as the Governor may deem necessary and proper . . . .

(c) In cases of legal service in civil matters to be performed for any state department . . . agency [or] entity . . . where it is impracticable or uneconomical for the Attorney General's office to render same, special counsel may be employed but only upon the written recommendation of the Attorney General . . . .

(d) In cases where the Attorney General certifies to the Governor that it would be improper for the Attorney General's office to render legal services due to a conflict of interests, or that he is unable to render certain legal services, the Governor may employ special counsel *or other assistance* to render such services as may be necessary.

*Id.* § 2.1–122(a), (c), (d) (1987) (emphasis added). Although these two statutes are the only provisions in the Code of Virginia directly addressing the circumstances under which powers of the Attorney General can be delegated away from that office, the Governor urges consideration of one additional provision, not found within the Code,[8] but buried within the Appropriation Act. Within a section of that Act entitled "Special Conditions and Restrictions on Expenditures" is the following language:

All attorneys authorized by this act to be employed by any state agency, and all attorneys compensated out of any monies appropriated in this session of the General Assembly shall be appointed by the Attorney General . . . provided, however, that if the Governor certifies the need for inde-

---

[8] Section 9–77.9 of the Code of Virginia provides for codification only of "all general and permanent statutes enacted at each regular session and at all special sessions." Va. Code Ann. § 9–77.9 (1989).

pendent legal counsel for any Executive Department agency, such agency shall be free to act independently of the Office of the Attorney General, in regard to selection, and provided, further, that compensation of such independent legal counsel shall be paid from the monies appropriated to such Executive Department agency or from the monies appropriated to the Office of the Attorney General.

1992 Va. Acts 1987 (Ch. 893, § 4–5.04(a)(1)). The Governor would have the court view this provision as a separate source of statutory authority for his actions, arguing, in part, that if this section is seen as conflicting with either § 2.1–121 or § 2.1–122, then it was the intent of the legislature that the Appropriation Act provision prevail. "This act shall prevail over all other laws of the Commonwealth which may be in conflict therewith until July 1, 1994, at which time this act shall expire." 1992 Va. Acts 2003 (Ch. 893, § 4–1100).

The Virginia Supreme Court has ruled that changing codified law within an Appropriation Act is not facially invalid, despite Article IV, section 12, of the Virginia Constitution which provides: "No law shall embrace more than one object, which shall be expressed in its title." Va. Const., art. IV, § 12. Ruling on the application of this provision, the court noted:

> Plainly, matters unrelated and not to be expected should not be injected into a bill in order to secure the support of hesitant members of the General Assembly, or for any other reason. *But matters germane to the object, made manifest by its title, may be included.* Those things are germane which are allied, relative or appropriate.

*Commonwealth v. Dodson*, 176 Va. 281, 305, 11 S.E.2d 120, 131 (1940) (emphasis added). Accordingly, the court upheld the constitutionality of a predecessor of current § 4–5.04(a)(1) which authorized certain attorneys to be employed and supervised by the Attorney General within his own Department of Law. This provision was viewed as "congruous and germane" to the Appropriations Act because that authority was "intimately interlocked" with the successful administration of the Attorney General's office. *See id.* at 302, 307, 11 S.E.2d at 130, 132.

More recently, the Attorney General has affirmed the continued validity of the position taken by the *Dodson* court.

> [Section] 12 of Art. IV applies to the Appropriation Act, but, as the Supreme Court held in the *Dodson* case, the inclusion

of provisions in such an act amending the organization of Virginia's government in a manner contrary to that established by general law does not violate the Constitution if those provisions have congruity or are germane to the subject matter of the act.

Op. Att'y Gen. (March 9, 1984) (reprinted in 19831–84 Report of the Att'y Gen. 66, 67).

If the cited provision of the 1992 Appropriation Act clearly contradicted portions of the Virginia Code, this Court would have to decide whether that provision was germane to the subject matter of the Act. Fortunately, the Court need not decide whether the successful administration of the Executive Branch is sufficiently "intimately interlocked" with a provision that the Governor argues effectively empowers him to replace the Attorney General in all facets of her representation of a state agency.

This Court believes that the interpretation of § 4–5.04(a)(1) urged by the Governor is a strained one - implicitly repealing the specific provision of § 2.1–121 which forbids the employment of any "regular counsel" for or by any state entity, including the Governor. *See* Va. Code Ann. § 2.1–121. "In the construction of legislative acts, courts do not favor repeal by implication." *Cross v. City of Newport News*, 217 Va. 202, 205, 228 S.E. 113, 116 (1976). This general rule applies " 'with full vigor' when the subsequent law is an appropriations measure." *City of Los Angeles v. Adams*, 556 F.2d 40, 49 (D.C. Cir. 1977).

Because § 2.1–121 is not irreconcilable with § 4–5.04(a)(1), the Court does not accept the proposition that the latter effectively repeals a portion of the former. "The presumption is always against the intention to repeal where express terms are not used. To justify the presumption of an intention to repeal one statute by another, the two statutes must be irreconcilable. If by a fair and reasonable construction they can be reconciled, both must stand." *Lambert v. Barrett*, 115 Va. 136, 139, 78 S.E. 586, 587 (1913); *see also Blue v. Virginia State Bar*, 222 Va. 357, 359, 282 S.E. 6, 8 (1981) ("A statute should be construed, where possible, with a view toward harmonizing it with other statutes.").

The most reasonable interpretation of § 4–5.04(a)(1) is not to view it as granting additional authority to the Governor to appoint "independent counsel" whenever he certifies such a need, but to view the provision as simply providing certain procedural and appropriations

guidelines in those instances when the Governor, pursuant to other statutory authority, certifies a need for special or independent counsel within the Executive Branch. In other words, when, under § 2.1–122(a), the Governor issues an exemption order certifying the need for special counsel within the executive branch, that counsel shall be selected without participation of the Attorney General and may be paid either by agency funds or funds of the Office of the Attorney General.[9] This provision is an exception to the general rule recited earlier in the provision that outside attorneys are appointed by the Attorney General. *See* 1992 Va. Acts 1987. This interpretation squares not only with logic but with the little legislative history available to this Court.[10]

Two relevant changes were made in § 2.1–122 in 1976. Language requiring the Governor to proclaim "an emergency" prior to appointing "special counsel" was eliminated and substituted with the present language regarding an "exemption order." *See id.* at 1138. Additionally, subsection (d) was added, authorizing the Attorney General to certify to the Governor the need for "special counsel or other assistance to render such services as may be necessary." *See id.* at 1138–39. Significantly, neither subsection (a) nor subsection (d), unlike subsections (b) and (c), addressed the source of compensation. *See id.*

The fact that new subsection (d) and revised subsection (a) of § 2.1–122 were enacted in the same legislative session that first adopted the cited Appropriation Act language gives credence to the proposition that both were intended to be read together as supplementary, not contradictory. *See Lillard v. Fairfax County Airport Authority*, 208 Va. 8, 13, 155 S.E.2d 338, 342 (1967) ("Where two statutes are passed by the same session of the legislature . . . that fact furnishes strong evidence that they were intended to stand to-

---

[9] For example, the Governor may be empowered, pursuant to § 2.1–122(a) to appoint "special counsel" for the discreet purpose of handling a state agency's appeal of an adverse judicial determination if he felt such services could better be provided by independent counsel. Were the agency an Executive Branch agency, compensation of that special counsel, pursuant to the Appropriation Act § 4–5.04(a)(1), would be paid either by the agency or the Attorney General's Office.

[10] The Court notes that this provision first appeared in the Appropriations Act in 1976, the same year that changes appeared in the predecessor to § 2.1–122 of the Virginia Code. *See* 1976 Va. Acts 1138–39, 1425.

gether.") (quoting *City of South Norfolk v. City of Norfolk*, 190 Va. 591, 602, 58 S.E.2d 32, 37 (1950)). Therefore, a reasonable interpretation giving effect to § 2.1–122 *and* the Appropriation Act provision is that the latter merely answered a question about compenstion of outside counsel left unanswered by both subsections (a) and (d) of § 2.1–122. This interpretation was supported by the testimony of Andrew Miller, who was Attorney General in 1976, and a participant in the legislative process. "What I viewed the Appropriation Act as doing was providing for the first time with respect to 122(a) and 122(d) a mechanism by which payment would be made . . . ." (Tr. of December 22 Hearing at 47.)

Accordingly, the Court does not believe that § 4–5.04(a)(1) of the 1992 Appropriation Act adds to the Governor's authority to appoint "special" or "independent" counsel under § 2.1–122 of the Virginia Code. If such authority does exist, it must arise from § 2.1–122 itself.

As noted earlier, the language of § 2.1–121 is clear. "No regular counsel shall be employed for or by the Governor or any state department . . . agency [or] entity . . . ." Va. Code Ann. § 2.1–121. This sentence is preceded by a provision that "All legal service in civil matters . . . shall be rendered and performed by the Attorney General, *except as hereinafter provided in this chapter.*" *Id.* (emphasis added). Hence the section clearly provides that there are stated exceptions to the general rule that all legal services are provided by the Attorney General; no exceptions are provided for in the second general rule, that no regular counsel is to be employed.

Section 2.1–122 appears as a list of exceptions foreshadowed by the opening sentence of § 2.1–121 regarding legal services to be provided by the Attorney General's Office. To view § 2.1–122 as a non-foreshadowed exception to the second sentence of § 2.1–121 is to force a strained interpretation that effectively repeals that second sentence. *Cf. Graybeal v. Commonwealth*, 228 Va. 736, 739, 324 S.E.2d 698, 699–700 (1985) ("[T]he plain, obvious, and rational meaning of a statute is always preferred to any curious, narrow or strained construction."). Therefore, the Court finds that § 2.1–122(a) only authorizes the Governor to appoint "special counsel" to state agencies for discreet purposes, not to perform all representative duties.

The apparent absoluteness of the prohibition in § 2.1–121 against the employment of "regular counsel" other than the Office of the

Attorney General is consistent with the role of the Attorney General as the state's chief legal officer, the official ultimately responsible for setting the state's legal policy both overall and with respect to individual state agencies and entitles. *See State v. Marion County Super. Ct.*, 268 Ind. 3, 6, 373 N.E.2d 145, 148 (1978) (office of attorney general intended "to give the State independent legal representation and to establish a general legal policy for State agencies"); *Secretary of Admin. & Fin.*, 326 N.E.2d at 338–39 (independent office of attorney general designed to provide a unified legal policy for the state).

The Governor's letter of December 21, 1992, refers to the broad scope of duties assigned to "special counsel" appointed in the past by the Attorney General. Indeed, former Attorney General Miller, in his testimony, confirmed that on occasion, the Attorney General has shifted all representative responsibilities for certain state entities to "special counsel." (Tr. of Dec. 22, 1992, Hearing at 54–55). However, a critical distinction, acknowledged even in the Governor's letter, is that such counsel were appointed by the Attorney General and therefore remained under the control of the Office of Attorney General. Because the Attorney General appointed such counsel and retained ultimate responsibility for the acts of such counsel, he did not, as he could not do under § 2.1–121, free himself from his role as "regular counsel." *Cf.* Va. Code Ann. § 2.1–122(c) (authorizing Attorney General, for reasons of impracticality or economics, to recommend employment of special counsel to provide legal services to state entities, with an ongoing requirement that the Attorney General approve all compensation sought by such special counsel). This is the fatal weakness in the Governor's attempt to bootstrap his authority to that granted the Attorney General to delegate her own duties; the Governor attempts to separate the Attorney General from the supervisory role her position as chief legal officer dictates even after *she* has appointed "special counsel." The Governor's appointed "independent counsel . . . [would] have a scope of responsibilities commensurate with those of similarly-situated special counsels previously appointed by several Attorneys General . . . . [but he would] not . . . be subject to the supervision, direction or control of you or your office . . . ." (Governor's Letter of Dec. 21, 1992, at 5).

Arguably, subsection (d) of § 2.1–122 allows more leeway in the employment of outside counsel by allowing the Attorney General to certify "that he is unable to render legal services" and, by so doing,

enabling the Governor to "employ special counsel *or other assistance to render such services as may be necessary.*" Va. Code Ann. § 2.1–122(d) (emphasis added). However, this subsection is of no use to the Governor in the instant case, for certification must originate with the Attorney General, and her lawsuit stands in stark opposition to such a certification. This requirement that the Attorney General certify a need for outside counsel under this subsection is also consistent with her role as the state's chief legal officer. To interpret this subsection, in conjunction with subsection (a), as empowering the Governor to make that determination on his own, is to allow this governor to accomplish implicitly what the General Assembly has explicitly refused to do, alter the traditional relationship between these two elected officials.

When a commission proposed in 1927 to make the Attorney General an official appointed by the Governor, leaving the Governor as the only official elected state-wide, Governor Byrd responded by arguing that the Attorney General "is a check on the chief executive when the powers of the Governor require interpretation. . . . [H]e should be unembarrassed if the Governor's own acts come to him for an opinion." Morris, *The Office of Attorney General in Virginia*, 56 U. Va. Newsletter 2 (April, 1980) (omission in original). Largely as a result of the Governor's opposition, the notion of an appointed Attorney General was stillborn. *See* W. Cooper & T. Morris, *Virginia Government and Politics* 222 (1976).

Because the common law authority of the Attorney General in the American electoral system counsels against official intrusion on her independence and because there appears to be nothing within Virginia statutes authorizing such an intrusion, this Court finds that the Governor lacks the authority to remove and replace the Attorney General from her statutorily-imposed role as "regular counsel" for VRS. The Governor's letters of December 10, 1992, and December 21, 1992, seek to remove and replace the Attorney General in all capacities as legal representatives of the VRS, a removal and replacement that is no different from removing her as "regular counsel." Consequently, the Court declares that those letters are without legal effect.

Because the Governor has announced his intention to abide by the ruling of this Court during the pendency of any appeal, the Attorney General's office has withdrawn its request for a Permanent Injunction. Accordingly, the Court reaches no decision on the merits of that Petition.